# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | | |
|---|---|---|
| **KAREN S. WALKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 6:14-CV-25** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Karen S. Walker ("Walker") challenges the decision of the Commissioner of Social Security ("Commissioner") determining that she was not disabled and therefore not eligible for supplemental security income ("SSI"), and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381–1383f. Specifically, Walker alleges that the ALJ erred by failing to give the opinions of her treating physicians controlling weight, improperly discounting her credibility, failing to consider all of the functional limitations imposed by her severe impairments, and failing to consider the mental requirements of her past relevant work. I conclude that substantial evidence supports the Commissioner's decision on all grounds. Accordingly, I **RECOMMEND DENYING** Walker's Motion for Summary Judgment (Dkt. No. 15), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 18.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence supports the Commissioner's conclusion that Walker failed to demonstrate that she was disabled under the

1

Act.[1] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Walker protectively filed for SSI and DIB in January 2011, claiming that her disability began on June 6, 2010.[2] R. 18, 270–75. Walker later amended her onset date to December 16, 2010. R. 38–39. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 147–57. On November 16, 2012 and March 18, 2013, ALJ Benjamin McMillion held hearings to consider Walker's disability claim. R. 34–69. Walker was represented by an attorney at the hearings, which included testimony from vocational expert Asheley Wells. Id.

On April 15, 2013, the ALJ entered his decision analyzing Walker's claim under the familiar five-step process,[3] and denying Walker's claim for disability. R. 18–31. The ALJ found

---

[1] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[2] Walker's date last insured was December 31, 2015. R. 20. Thus, she must show that her disability began before that date and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a).

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform

2

that Walker suffered from the severe impairments of degenerative disc disease of the lumbar and cervical spine; headaches; history of seizure-like activity; depression; anxiety; bipolar disorder; and attention deficit disorder. R. 20. The ALJ further found that Walker retained the RFC to perform a range of medium work; and specifically, that she can lift and carry up to 25 pounds frequently and 50 pounds occasionally; can sit, stand or walk up to 6 hours in an 8 hour workday with normal breaks; can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; and can never climb ladders, ropes or scaffolds. R. 22. The ALJ found that Walker should avoid concentrated exposure to extreme cold, wetness, vibration, fumes, odors, gases, dust, poor ventilation, and all hazards. The ALJ also determined that Walker is limited to simple, one-to-two step job instructions. R. 23.

The ALJ determined that Walker is capable of performing her past relevant work as a produce clerk and waitress. R. 29. The ALJ also found that Walker could work at other jobs that exist in significant numbers in the national economy, such as assembler, library shelving clerk, and night cleaner. R. 30. Thus, the ALJ concluded that Walker was not disabled. R. 31. On May 13, 2014, the Appeals Council denied Walker's request for review (R. 1–5), and this appeal followed.

## ANALYSIS

Walker alleges that the ALJ erred by (1) giving little weight to the opinions of her treating physicians that she has marked limitations in all areas of mental health functioning; (2) failing to properly account for her limitation with concentration, persistence, or pace; (3)

---

other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

improperly assessing her credibility; (4) failing to consider all of the functional limitations imposed by her severe impairments; and (5) failing to consider the mental requirements of her past relevant work. Having reviewed the record as a whole, and for the reasons stated below, I find that the ALJ's decision is supported by substantial evidence and should be affirmed.

### Treating Physicians

Walker asserts that the ALJ erred by giving little weight to the opinions of her treating psychiatrists, Philip Halapin, M.D., and Darin Christensen, Ph.D. that she suffers from marked to extreme limitations in almost all areas of mental functioning. The ALJ recognized that Drs. Halapin and Christensen were Walker's long-time treating psychiatrists, but found that their opinions as to her mental functioning were extreme, unsupported by their treatment notes and inconsistent with the evidence as a whole. The ALJ instead relied upon the opinions of a consulting neurologist and the state agency reviewing physicians that Walker suffered from mild to moderate limitations in the various areas of mental functioning.

Walker was 42 years old on the date of the ALJ's decision. She suffers from various impairments, including back pain, headaches, depression, anxiety, bipolar disorder, attention deficit disorder, and seizure-like activity. Walker has a high school diploma and previously worked as a mail carrier, produce clerk/manager, cafeteria worker, dental assistant, and waitress. R. 39, 64. Walker's attention-deficit disorder, bipolar disorder, depression and anxiety have been treated with multiple medications prescribed by her treating psychiatrists. Walker has also been afflicted with seizure-like events, beginning in 2010, which were initially blamed on withdrawal from the medication Klonopin, but allegedly continued throughout the relevant period.

Walker first presented to the emergency room for an apparent seizure on December 16, 2010. R. 414–23. Walker reported that she experienced increasingly worsening symptoms after

discontinuing Klonopin and starting Celexa, including shortness of breath, heart palpitations, anorexia and insomnia. She became very anxious after being told to report to work during a snowstorm, and her boyfriend found her on the floor shaking, not breathing and cyanotic. CT scans of Walker's head and brain were normal, and she was diagnosed with a potential adverse reaction to Celexa. R. 417–21. Walker was discharged with instructions to resume taking Klonopin. R. 425. Walker stopped working after this incident. R. 311.

Shortly after this event, Walker's treating physician discovered that she was taking more than the prescribed amount of Adderall, which lowered her seizure threshold. R. 443. She presented to her doctor with a constricted affect and moderately depressed and anxious mood, and was diagnosed with major depression disorder with comorbid anxiety. Id.

Walker visited her treating psychiatrist, Philip Halapin, M.D., on February 24, 2011, and he noted that she was off all her medications and complaining of headaches. R. 442.[4] Dr. Halapin concluded that Walker probably had post-concussion syndrome after falling during her seizure. R. 442. He also noted that he would try to help her with short-term disability. Id. In March 2011, Dr. Halapin noted that Walker was "not really functional" and "has terrible headaches all day." R. 491. In April 2011, Dr. Halapin noted that Walker was denied social security disability, and "has not had a very good time of it." R. 492. He noted "a lot of psychiatric problems, medication toxicity, seizures, concussion, headaches, difficulty concentrating, irritability, insomnia," and continued her on Klonopin. Id.

In May and July 2011, Dr. Halapin's treatment notes reflect that Walker was depressed, tearful and crying. R. 493. He prescribed Abilify, which helped her feel less angry and moody. R. 494. Dr. Halapin noted that Walker is still struggling with disability, difficulty concentrating

---

[4] Dr. Halapin's treatment notes throughout the relevant period are primarily medication visit reports, recording Walker's symptoms and adjusting her medications. Dr. Halapin's treatment notes do not contain mental status exams. R. 442, 491–94, 537–44.

and headaches. He wrote, "she does seem to have some kind of fainting spells that she has had all her life, perhaps due to stress. Things are overall, slightly better. She really could use her disability to avoid additional stress. She is certainly not able to work." R. 494.

On June 15, 2011, Kelly Gwathmey, M.D., performed a neurological evaluation of Walker for a possible seizure disorder. R. 475–77. Dr. Gwathmey found Walker's exam to be normal, with the exception of delayed recall and an attention problem. R. 477. Dr. Gwathmey found that Walker likely had a provoked seizure from abruptly discontinuing her medication, and did not recommend initiating an antiepileptic medication. Id. Dr. Gwathmey also ordered an EEG and MRI. The MRI showed no significant abnormalities, and the EEG revealed the presence of intermittent left temporal slowing, suggesting an area of potential underlying neuronal dysfunction. R. 480, 601. She recommended neuropsychologic testing to further evaluate Walker's cognitive impairment. Dr. Gwathmey also recommended that Dr. Halapin use certain medications for Walker's mood disorders that would also help her headaches. Id.

In August 2011, Dr. Halapin discontinued Abilify due to Walker's complaints of restlessness and racing anxiety. R. 544. He noted that Walker has a lot of compulsive type behaviors such as spending money on the internet. He continued Walker on Trazodone and Klonopin. Id.

On August 22, 2011, Kathleen Fuchs, Ph.D., performed a neuropsychological evaluation to evaluate Walker's cognitive functioning. R. 601–05. Dr. Fuchs concluded that Walker's intellectual functioning is in the average range. R. 604. Her processing speed varied from borderline impaired to low average, and all other areas of cognitive functioning, including simple immediate attention, working memory, verbal and visual learning and memory and executive functioning were intact. Id. Dr. Fuchs noted significant depression and anxiety as well as

6

emotional lability and confused or disorganized thought processes. Dr. Fuchs determined that Walker would likely benefit from a referral to vocational rehabilitation to assess her strengths and weaknesses, but with appropriate treatment of her depression it is likely that she can return to work in the future. R. 605.

In September 2011, Dr. Halapin saw Walker and wrote, "[s]he got a neuro-psychiatric evaluation up at UVA that says that yeah, she has a lot of problems but not enough to qualify for disability, which is pretty disappointing. We tried to help her process that and not to take it too personally." R. 543. Dr. Halapin noted that Walker has some neurological problems, concussion, seizure, post concussion syndrome, as well as anxiety, depression, panic attacks, mood disorder, exacerbated by poor diagnosis and poor treatment. He noted that Walker has lots of stress and no money. Id. In October and November 2011, Dr. Halapin stated that Walker was still acting in a bipolar fashion and he increased her Lamictal dosage. R. 541–42. He also reported that she was in a slightly better mood. R. 540. In December 2011, Dr. Halapin noted that Walker was anxious, and he adjusted her medications, adding Adderall back to her medication regimen, which Walker reported helped. R. 539–40. Dr. Halapin's last treatment note was January 2012, when he renewed her prescriptions, and noted that Walker's neurologist at UVA doesn't think she's been having seizures. R. 532.

On March 3, 2012, psychiatrist Darin Christensen, M.D., took over for Dr. Halapin as Walker's treating psychiatrist. R. 535. Dr. Christensen performed a mental status exam and noted that Walker presented as alert and cooperative; she had no psychomotor agitation; her speech tone and volume were normal, but her speech rate was slow; her mood was good; her affect was congruent and constricted; and her thought form was logical and linear. Id. Dr. Christensen diagnosed depressive disorder and attention-deficit disorder. Id.

7

Walker continued to seek treatment with Dr. Christensen through October 2012. R. 529–34, 637–44. In May 2012, Walker presented as "tearful, upset, frustrated by inability to access disability." R. 534. Dr. Christensen discontinued Walker's Klonopin, and tried incorporating Trazodone and Ambien along with Adderall, Lamictal and Wellbutrin. Id. Walker presented to the emergency room on June 10, 2012, relating that she was again taken off her Klonopin and feels like she will have a seizure. R. 518. On exam, Walker was anxious and inappropriate, with hesitant but yet hurried pressured speech. Id. Walker complained of neck and back pain, but her physical examination was normal. She was diagnosed with anxiety and a urinary tract disorder and discharged. R. 521. Walker returned to the emergency room the next day, again complaining of seizures. R. 510. She reported all over body shaking and shortness of breath. The physician found no clinical evidence to support a seizure and discharged Walker. R. 513.

In June 2012, Walker presented to Dr. Christensen as distraught and agitated because her Klonopin was discontinued. R. 532. Dr. Christensen noted that Walker's neurologist doesn't think she's been having seizures. Id. He continued her on Trazodone, Wellbutrin, Lamictal and Adderall.

Walker visited her pain management physician, Ward Gypson, M.D., on July 20, 2012, and had a pseudo seizure during the exam, groaning and shaking uncontrollably, although alert at all times. R. 569–71. Walker was transferred to the emergency room for further evaluation. At the emergency room, Walker reported 17 of these episodes in the past six months with tremors, head pressure and paresthesias in her hands and legs. R. 606. Walker's neurological examination was normal aside from periodic shaking of all four extremities and cold sensation of her face. R. 608.

8

In August 2012, Dr. Christensen recommended that Walker attend psychotherapy, and continued to adjust Walker's medications. R. 529. In September 2012, Walker presented as anxious and sad, and noted panic attacks especially in stores. R. 645.

Walker visited Stephanie RiCharde, M.A., for counseling in October 2012, and reported that she had two more seizures back to back. Walker stated that she lacks control over her life. R. 642. Ms. RiCharde led Walker through breathing exercises, and gave her some affirmations of self-esteem to review. Id. On October 26, 2012, Dr. Christensen noted that Walker seems less nervous and upset overall, but still has seizure-like episodes, which occur as a function of panic. R. 640. On October 31, 2012, Walker reported to Ms. RiCharde that she recently had another seizure-like episode, and has been experiencing visual and auditory hallucinations for the past few months. R. 637. Walker did not feel that she could eliminate any of the stressors in her life, and was given a medication lockbox so that her boyfriend could manage her medications. Id. On December 14, 2012, Walker again had a pseudoseizure while visiting Yonas Tamrat, M.D., as a new patient. R. 692–93. Walker reported having the attacks regularly when she was stressed out. Her neurologic exam was normal. R. 692.

The record contains multiple opinions with regard to Walker's functional limitations arising from her mental impairments. On April 18, 2011, state agency psychological consultant Louis Perrott, Ph.D., reviewed the evidence and determined that Walker had mild limitation in activities of daily living and moderate limitations in social functioning and maintaining concentration, persistence, and pace. R. 76–82. Dr. Perrott concluded that Walker would be able to understand and remember simple 1–2 step tasks and maintain concentration for simple tasks, but had limited ability understanding, remembering and carrying out detailed instructions. He found that she is limited in her ability to work around others without distraction, but that she is

9

capable of being punctual and sustaining regular attendance, and could ask simple questions and request assistance appropriately. R. 80–82. Overall, Dr. Perrott concluded that Walker can perform simple, routine, non-stressful work. R. 82. State agency psychiatric consultant Andrew Bockner, M.D., reviewed the evidence on August 13, 2011, and concurred with Dr. Perrott's conclusions. R. 110–15.

As noted above, on August 22, 2011, Dr. Fuchs concluded that Walker 's intellectual functioning is in the average range, her processing speed varied from borderline impaired to low average, and all other areas of cognitive functioning, including simple immediate attention, working memory, verbal and visual learning and memory and executive functioning were intact. R. 604. Dr. Fuchs determined that Walker would likely benefit from a referral to vocational rehabilitation to assess her strengths and weaknesses, but with appropriate treatment of her depression it is likely that she can return to work in the future. R. 605.

Dr. Halapin performed mental capacity assessments of Walker on September 20, 2011 (R. 499–501) and October 27, 2011 (R. 505–07). Dr. Halapin's September assessment listed Walker's functioning as "marked" for every category.[5] In support, Dr. Halapin noted Walker's various mental health diagnoses. R. 501. One month later, Dr. Halapin completed another assessment and changed several of the functional categories previously checked "marked" to "extreme."[6] Dr. Halapin did not note any medical or clinical findings in support of his October assessment. R. 505–07.

Dr. Christensen completed a mental capacity assessment of Walker on September 7, 2012. R. 562–64. Dr. Christensen determined that Walker had moderate impairments in her

---

[5] The form defines "marked" as a serious limitation in this area and the individual cannot generally perform satisfactorily in this area. R. 499.

[6] The form defines "extreme" as a major limitation in this area and the individual has no useful ability to function in this area. R. 505.

10

ability to understand, remember and carry out very short and simple instructions, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, interact appropriately with the general public and respond appropriately to changes in the work setting. Dr. Christensen found that Walker had slight impairments with the ability to ask simple questions, get along with coworkers or peers, maintain socially appropriate behavior, be aware of normal hazards, and travel in unfamiliar places. Dr. Christensen found that Walker had either marked or extreme limitations with the remaining areas of functioning. R. 562–64.

In his decision, the ALJ considered all of Walker's relevant medical evidence in accordance with the regulations, and determined the appropriate weight to give each opinion in the record. R. 27–29. The ALJ gave the opinions of the state agency psychiatrists that Walker has mild limitation in activities of daily living and moderate limitation in maintaining concentration, persistence and pace significant weight. R. 28. The ALJ deviated from the state agency psychiatrists' opinions only in his finding that Walker suffered from a mild limitation in social functioning, based upon her ability to socialize with family, communicate properly and generally interact socially. Id.

The ALJ gave Dr. Fuchs' opinion great weight, noting that Dr. Fuchs was a board certified clinical neuropsychologist and conducted a full psychological examination of Walker. R. 29. The ALJ found Dr. Fuchs' conclusions that Walker is of normal intelligence, has an average ability to concentrate, has a generally intact working memory, has average judgment, has slow processing speed, and could return to work with appropriate treatment to be strongly supported by objective findings and consistent with the record as a whole. Id.

Case 6:14-cv-00025-NKM-RSB   Document 24   Filed 08/11/15   Page 11 of 26   Pageid#: 833

The ALJ gave the opinions of Dr. Halapin little weight, finding them to be unsupported by the evidence of record. The ALJ acknowledged that Dr. Halapin was Walker's treating physician and that his treatment notes were consistent over time. R. 28.  However, the ALJ determined that Dr. Halapin's findings were generally unsupported by the evidence of record. The ALJ concluded that the majority of Dr. Halapin's opinions are based upon Walker's seizures, which were never formally diagnosed. Id.  The ALJ also noted that Dr. Halapin checked every "marked" box on the page, but provided no explanation of clinical findings that would support such dramatic results.  The ALJ found Dr. Halapin's conclusions to be extreme, considering that he only treated Walker with medication, and did not refer her to psychotherapy or a specialist for more targeted treatment. R. 28.  The ALJ also suspected that Dr. Halapin's opinions were "geared toward showing [Walker] is disabled, without true consideration of each category independently." Id.

The ALJ likewise gave Dr. Christensen's opinion little weight, finding that he provided little explanation and clinical support for his conclusions.  R. 28.  The ALJ concurred with Dr. Christensen's limitations regarding concentration and memory "to a point," but found that these limitations should be moderate based on the clinical findings. R. 29.  The ALJ found no precedent for Dr. Christensen's finding that Walker cannot maintain a schedule, complete a workday or workweek, or has extreme inability to maintain concentration for extended periods. The ALJ noted that Walker did not miss her treatment appointments with high frequency, and there was no indication that she could not follow instructions, aside from her failure to comply with medications. R. 29.  Thus, the ALJ concluded that if the extreme elements are not considered, Dr. Christensen's opinion was consistent with an ability to handle short, simple, repetitive one-to-two step job instructions. R. 29.  The ALJ also noted that the opinions of Drs.

12

Halapin and Christensen diverged significantly from the findings of Dr. Fuchs and the state agency psychologists.

Walker argues that the ALJ's decision to give little weight to the opinions of Drs. Halapin and Christensen was erroneous and not supported by substantial evidence. Specifically, Walker argues that the ALJ failed to point to persuasive contrary evidence that would warrant a rejection of Dr. Halapin and Dr. Christensen's opinions, and that the ALJ failed to properly evaluate the factors as required by the regulations.[7]

A treating physician's opinion is not automatically entitled to controlling weight. The social security regulations require that an ALJ give the opinion of a treating source controlling weight, if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. Id.; Saul v. Astrue, Civ. Action No. 2:09-cv-1008, 2011 WL 1229781 (S.D. W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. § 416.927(c)(2)–(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating

---

[7] The regulations require the ALJ to consider all of the factors under 20 C.F.R. § 404.1527(c) when evaluating the physicians' opinions; however, the ALJ is "not required to make a seriatim assessment as if it were a sequential evaluation." Vaughn v. Astrue, No. 4:11-cv-29, 2012 WL 1267996, at *5 (W.D. Va. Apr. 13, 2012). Here, the ALJ considered all of Walker's treatment records in detail, noted that Drs. Halapin and Christensen were her long-time treating psychiatrists, noted their specializations, and found that their opinions were not supported by medical evidence and were inconsistent with the record as a whole. Thus, the ALJ followed the requirements of the regulations.

physician's opinion." Ricks v. Comm'r, No. 2:09cv622, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010). Here, the ALJ considered all of the relevant factors, and his decision to afford less weight to the opinions of Drs. Halapin and Christensen is supported by the record.

The opinions at issue are checkbox forms, which have limited probative value. See Leonard v. Astrue, No. 2:11cv00048, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (citing Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Such check-the-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician.") Further, none of the forms state findings to support the physicians' conclusions, aside from Dr. Halapin's recitation of Walker's diagnoses on his September 2011 opinion.[8]

Additionally, the timing and substance of Dr. Halapin's opinions undermine their reliability. Dr. Halapin rendered two mental capacity assessments of Walker one month apart. In his September 2011 opinion, Dr. Halapin checked the "marked" box for every single mental limitation. R. 499–501. One month later, Dr. Halapin completed a second opinion, changing various boxes from "marked" to "extreme," without citing to any clinical findings or providing any explanation to justify the increase in severity. R. 505–07. Dr. Halapin's treatment note for October 2011 provides no explanation for the "extreme" limitations, stating only that Walker is still acting out in her bipolar fashion and he tried to educate her on impulse control strategies. R. 542. Dr. Halapin noted that Walker needs more help, referencing her daily headaches, but

---

[8] Diagnosis of a mental impairment alone is insufficient to establish disability. Cameron v. Astrue, No. 7:10–cv–58, 2011 WL 2945817, at *8 (W.D. Va. July 21, 2011) (citing Gross v. Heckler, 785 F.2d 1163, 1165–66 (4th Cir. 1986); 42 U.S.C. § 423(d)(2)(A)).

then stated that "overall she is in a slightly better mood." Id. Thus, the record does not support the changes in Dr. Halapin's opinions rendered one month apart.

Further, Dr. Halapin's treatment notes do not contain clinical findings or mental status exams to support his opinion that Walker suffers from "marked" and "extreme" limitations in all areas of mental functioning. R. 442, 491–94, 537–44. Dr. Halapin's treatment notes reflect that Walker often presented as depressed, anxious, tearful and crying. Id. There is no indication in Dr. Halapin's records that he performed mental status examinations of Walker. Rather, his treatment notes reflect documentation of Walker's subjective complaints of headaches, difficulty concentrating, irritability, insomnia, seizures and compulsive behaviors. Dr. Halapin's documentation of Walker's complaints do not translate those complaints into clinical evidence or functional limitations. See Webb v. Astrue, No. 2:11-cv-103, 2012 WL 3061565, at *17 (N.D.W. Va. June 21, 2012) (citing Craig v. Chater, 76 F.3d 585, 590 n.2 (4th Cir. 1996)). Otherwise, Dr. Halapin simply managed Walker's medications. Dr. Halapin noted that Walker was "not functional," but provided no specific bases for this finding. R. 491, 494.

The ALJ also suspected that Dr. Halapin's opinions were issued in a cursory fashion geared towards reflecting that Walker was disabled, without true consideration of each category independently. Indeed, Dr. Halapin's treatment notes reflect a desire to assist Walker with obtaining social security benefits, consistent with his decision to check the marked and extreme categories for every single category of Walker's mental functioning. Dr. Halapin noted that he was trying to help Walker with short-term disability (R. 442); that "she could really use her disability to avoid additional stress" (R. 494); and that he was disappointed by Dr. Fuchs' conclusion that Walker does not qualify for disability (R. 543). Thus, substantial evidence supports the ALJ's decision to give Dr. Halapin's opinions little weight.

Dr. Christensen's opinion suffers from similar issues. Dr. Christensen's opinion is more varied than those of Dr. Halapin, and reflects that he considered each of the mental functioning categories individually; however, it includes no explanation or clinical findings to support his conclusions. Dr. Christensen's treatment notes include mental status examinations during each visit which reflect at worst a slow speech rate (R. 535) and tearful or distraught mood (R. 531, 533). Otherwise, Dr. Christensen consistently noted that Walker was alert, cooperative, had normal speech tone and volume, congruent affect, and logical and linear thought form. R. 531–35. The ALJ carefully considered Dr. Christensen's opinion and gave some portions of it more weight than others based upon his review of the evidence and the other opinions in the record. R. 28–29. The ALJ noted the divergence of the opinions of Drs. Halapin and Christensen from those of Dr. Fuchs and the state agency physicians. Substantial evidence in the record supports the ALJ's decision to give Dr. Christensen's opinion little weight.

Walker asserts that if the ALJ was not content with the explanations provided by Drs. Halapin and Christensen in their opinions, he had a duty to re-contact them to obtain further explanation for their opinions and fully develop the record. Pl. Br. Summ. J. 16, 20.[9] Walker argues that the ALJ "impermissibly discounted" the doctors' opinions "for his own lack of diligence." Pl. Br. Summ. J. p. 16.

Social Security Ruling ("SSR") 96–5p states that "if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." SSR 96–5p, 1996 WL 374183 (SSA) (July 2, 1996). Walker's argument attempts to expand this

---

[9] Walker cites 20 C.F.R. § 416.912(e)(1) in support of this argument; however, the provision cited by Walker was eliminated from the regulation when it was amended effective March 26, 2012.

16

provision to require that an ALJ recontact a treating physician every time the ALJ finds insufficient evidence in the record to support that physician's conclusions. That is not the standard. The opinions of Drs. Halapin and Christensen did not trigger the ALJ's duty to recontact because the opinions did not contain a conflict or ambiguity that must be resolved, and the record was not inadequate to determine if Walker was disabled. See, e.g. Groseclose v. Comm'r, No. SAG–13–0200, 2013 WL 5487857, at *2 (D. Md. Sept. 27, 2013); Majica v. Astrue, No. 06–2900, 2007 WL 4443247, at *3 (E.D. Pa. Dec. 18, 2007).

The ALJ noted no ambiguities or confusion regarding the content of Drs. Halapin and Christensen's opinions. Rather, he concluded that the conclusions reached by those doctors were not supported by the objective medical evidence.

Overall, the treatment notes of Walker's psychiatrists simply lack evidence to support their determination that she suffers from marked to extreme limitations in almost all categories of mental functioning. The ALJ carefully considered all of the evidence in the record, as is evident from his seven page recitation of the treatment records, Walker's testimony, and the opinion evidence. The ALJ gave great weight to the opinions of those physicians that he felt were supported by the record, and gave detailed reasons for his decisions to give little weight to the opinions of Drs. Halapin and Christensen. The ALJ followed the procedure dictated by the social security regulations and substantial evidence supports his decision.

### Concentration, Persistence or Pace

Walker asserts that the Fourth Circuit's recent decision in Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015), establishes that the ALJ erred by accounting for Walker's moderate limitations in concentration, persistence and pace by limiting her to simple 1 to 2 step

Case 6:14-cv-00025-NKM-RSB   Document 24   Filed 08/11/15   Page 17 of 26   Pageid#: 839

instructions.[10]  In Mascio, the Fourth Circuit held that an ALJ does not generally account for a claimant's limitations in concentration, persistence, and pace by restricting the claimant to simple, routine tasks or unskilled work. The court noted, "the ability to perform simple tasks differs from the ability to stay on task.  Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." Id. at 638; see also Sexton v. Colvin, 21 F. Supp. 3d 639, 642–43 (W.D. Va. 2014) (citing Wiederholt v. Barnhart, 121 Fed. Appx. 833, 839 (10th Cir. 2005) (holding that a "limitation to simple, unskilled work does not necessarily" accommodate a person's difficulty in concentrating on or persisting in a task, or maintaining the pace required to complete a task).  In Mascio, the Fourth Circuit found that the ALJ did not explain why Mascio's moderate limitation in concentration, persistence, or pace did not translate into a limitation in his RFC.  The court noted, however, that the ALJ may find that the concentration, persistence or pace limitation would not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. 780 F.3d at 638; see also Hutton v. Colvin, No. 2:14-cv-63, 2015 WL 3757204, at *3 (N.D.W. Va. June 16, 2015).

Mascio does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC.  Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision, especially where, as the ALJ held in Mascio, a claimant's concentration, persistence, or pace limitation does not affect the ability to perform simple, unskilled work. The ALJ has the responsibility to address the evidence of record that supports that conclusion.

---

[10] Walker filed a notice of supplemental authority with the court relating to the Mascio decision shortly before the scheduled hearing. Dkt. No. 21.  The court offered the parties the opportunity to file additional briefs with regard to the effect of the Mascio decision on this case, but both parties elected to address the issue through oral argument during the hearing.

Here, evidence supports the ALJ's conclusions that Walker can engage in simple 1 to 2 step instructions despite her limitations in concentration, persistence or pace. Specifically, Dr. Fuchs performed a neuropsychological evaluation of Walker and concluded that her processing speed varied from borderline impaired to low average. R. 604. Dr. Fuchs noted that Walker's immediate auditory attention was average, and she was able to repeat a series of 8 digits forward and four digits backward. R. 603. Her ability to sequence letters and numbers was average, suggesting generally intact working memory. Walker's speed on a visuomotor integration task involving simple number sequencing was borderline impaired; and her performance on a more difficult measure of processing speed requiring mental flexibility was low average, though she made no errors. Id. All other areas of Walker's cognitive functioning, including simple immediate attention, working memory, verbal and visual learning and memory and executive functioning were intact. R. 604.

The ALJ gave great weight to Dr. Fuchs' findings and conclusions. R. 29. The ALJ also gave great weight to the opinions of the state agency physicians, who concluded that Walker's ability to understand, remember and carry out very short and simple instructions was not significantly limited, and her ability to understand, remember and carry out detailed instructions was moderately limited. R. 80–82, 114–15. The state agency physicians concluded that Walker's "depression, ADD and personality disorder would limit her ability to understand and remember detailed instructions. However, she would be able to understand and remember simple 1-2 step tasks." R. 114. They also found that Walker would be expected to maintain concentration for simple tasks, be punctual and sustain regular attendance. Id. The ALJ limited Walker to only simple, 1 to 2 step instructions in the RFC specifically to account for her moderate limitations regarding concentration and memory. R. 29.

19

Thus, this is not a situation like Mascio, where the ALJ summarily concluded that a limitation of simple, unskilled work accounts for the claimant's moderate impairment in concentration, persistence and pace with no further analysis or consideration. Rather, the medical evidence supports the conclusion that, despite her moderate limitation in concentration, persistence, or pace, Walker is capable of performing the basic mental demands of simple work with 1 to 2 step instructions. This court is not "left to guess about how the ALJ arrived at his conclusions." Mascio, 780 F.3d at 637; see also Massey v. Colvin, No. 1:13cv965, 2015 WL 3827574, at *7 (M.D.N.C. June 19, 2015); Hutton v. Colvin, No. 2:14-cv-63, 2015 WL 3757204, at *3 (N.D.W. Va. June 16, 2015).

**Physical RFC**

Walker also asserts that the ALJ erred by failing to fully accommodate her degenerative disc disease and degenerative joint disease in the RFC. Pl. Br. Summ. J. p. 22. Walker relies upon her diagnoses with both diseases, radiology reports evidencing the diseases, physical examinations showing decreased range of motion in her cervical and lumbar back and subjective testimony that she cannot sit or stand for long. Id.

Walker complained of dizzy spells, headaches, and radiating neck and low back pain to her treating physicians. R. 553, 582–83. On June 21, 2012, Ward Gypson, M.D., evaluated Walker for pain management of her neck and back pain. R. 577–80. On exam, Walker had tenderness along her cervical and lumbar regions and discomfort with range of motion testing R. 579. Walker had decreased sensation down her right upper extremity and left lower extremity, but full strength throughout, except for 4/5 bilateral upper extremity strength. Id. Dr. Gypson diagnosed Walker with chronic neck and low back pain with radiation into her extremities, right greater than left. R. 580.

20

Dr. Gypson ordered x-rays of Walker's cervical and lumbar spine. The x-ray of Walker's lumbar spine showed transitional vertebra at the lumbosacral junction with advanced degenerative disc and facet disease at the L4-transitional level. R. 630. The x-ray of Walker's cervical spine showed apparent bilateral neural foramen narrowing at C5–C6, but it was noted to be likely related to Walker's positioning on the films. R. 631. Nerve conduction studies of Walker's right upper and lower extremities were normal. R. 632–33.

In a follow up examination on June 27, 2012, Dr. Gypson prescribed Lidoderm patches and trigger point injections. R. 576. Walker reported that the Lidoderm patches seem to help, and that the worst pain is in her neck. R. 575. On exam, Walker again demonstrated decreased range of motion in her cervical and lumbar back, normal strength, normal muscle tone, normal gait and coordination, and tremor. Id.

July 19, 2012, Joanna Suski, M.D., evaluated Walker for her complaints of headaches. R. 571–774. Walker complained of headaches on a daily basis with nausea, vomiting, photophobia and phonophobia. Walker's exam was notable for occipital tenderness with radiation to the front of her head and flat affect. R. 573. Dr. Suski suggested that Walker continue to work with her psychiatrist to get her anxiety and panic attacks under control, and required no further follow up.

Walker followed up with Dr. Gypson on July 20, 2012, but had a pseudoseizure during the exam, groaning and shaking uncontrollably, but remained alert at all times. R. 569–71. Walker was transferred to the emergency room for further evaluation.

Walker received trigger-point injections from Dr. Gypson in August and September 2012. R. 566–68. Dr. Gypson noted that Walker should continue trigger point injections, that her

shoulders are moving better, and that the Lidoderm patches seem to help, although she still has soreness in her lower back. R. 566–67.

The ALJ considered Walker's medical records relating to her physical impairments, as well as her subjective testimony that she cannot stand, walk or sit for prolonged periods. R. 23–24. The ALJ noted that MRI's of Walker's cervical and lumbar spine reflected potential narrowing of the foramen at C5–C6 and degenerative disc disease at L4. R. 24. The ALJ also noted that a nerve conduction study showed no clinical indications of radicular abnormality or nerve impingement, despite Walker's subjective complaints of pain from the neck down her right arm, positive straight leg raise tests and limited range of motion in her neck. Id. The ALJ considered Walker's fairly limited treatment for her physical complaints, as well as her statement to Dr. Fuchs that she has no difficulty performing activities of daily living such as household chores and repairs, dressing and grooming. R. 602. Walker also reported hunting with her boyfriend. Id.

Walker does not offer any evidence to suggest error in the ALJ's analysis of her physical limitations, aside from emphasizing elements of the record regarding her severe physical impairments. The ALJ considered Walker's testimony, her diagnoses, and her medical records, including physical exams, and concluded that Walker was capable of performing a range of medium work, including sitting, walking or standing up to 6 hours in an 8 hour day with normal breaks. The ALJ's conclusion is consistent with the opinions of two state agency medical doctors who reviewed Walker's records. R. 78–80, 112–15. The record contains no medical opinions more physically limiting than the RFC provided by the ALJ. Thus, I find that the record supports the ALJ's RFC.

**Credibility**

Walker also asserts that the ALJ failed to properly assess her credibility. The ALJ determines the facts and resolves inconsistencies between a claimant's alleged impairments and her ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Walker's subjective allegations of disabling pain are not conclusive. Rather, the ALJ must examine all of the evidence, including the objective medical record, and determine whether Walker met her burden of proving that she suffers from an underlying impairment which is reasonably expected to produce her claimed symptoms. Craig v. Chater, 76 F.3d 585, 592–93 (4th Cir. 1996). The ALJ then must evaluate the intensity and persistence of the claimed symptoms and their effect upon Walker's ability to work. Id. at 594-95.

The ALJ found that Walker had medically determinable impairments that could be reasonably expected to produce her claimed symptoms, but that Walker's "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported by the medial evidence as a whole." R. 26. A reviewing court gives great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). After a review of the record as a whole, I find that substantial evidence supports the ALJ's determination that Walker's testimony regarding her disabling pain is only partially credible.

Walker asserts that it was improper for the ALJ to find her "less than fully forthcoming with her medical practitioners" with regard to her marijuana use because she admitted using

marijuana to Drs. Halapin and Christensen. See R. 449, 529. Although there is evidence that Walker's psychiatrists were aware of her *past* use of marijuana, there is no evidence in the record to reflect that they were aware of her current daily marijuana use, which she procures through sexual favors, as she testified at the administrative hearing. R. 27. Thus, it was appropriate for the ALJ to consider this discrepancy when evaluating Walker's overall credibility.

Walker also asserts that the ALJ should have evaluated her attempts at alleviating her symptoms when determining credibility; specifically, her use of Lidocaine injections and chiropractic care. Pl. Br. Summ. J. p. 24. It is apparent from the ALJ's decision that he considered Walker's use of Lidocaine injections, in addition to all of her medical treatment during the relevant period. See R. 24. The ALJ concluded that Walker's medical treatment was limited and indicated a lack of severity. R. 27.

Finally, Walker alleges that the ALJ's statement that she "indicated an inability to perform any household activities whatsoever," (R. 27) was incorrect because she testified that she can fold clothes, place clothes in the washing machine and cook a little. R. 55. However, Walker's testimony about her daily activities at the hearing differed significantly from her statements to Dr. Fuchs that she has no "difficulty with performing other activities of daily living (household chores and repairs, dressing, grooming)." R. 55, 602. Thus, this portion of the ALJ's credibility analysis is supported by the record.

Notably, the objections raised by Walker to the ALJ's credibility analysis address only three of the multiple reasons the ALJ noted when finding Walker less than fully credible. Further, the ALJ did not wholly discount Walker's subjective complaints and find her pain free. The ALJ in fact found that Walker suffers from severe impairments that limit her functionality in a significant way. The issue, however, is not whether Walker has impairments or experiences

24

symptoms, but whether those impairments and symptoms prevent her from performing the limited range of medium work provided for in the RFC. See Green v. Astrue, No. 3:10CV764, 2011 WL 5593148, at *4 (E.D. Va. Oct. 11, 2011) (citing Hays v. Sullivan, 907 F.2d 1453, 1457–58 (4th Cir. 1990)) ("An individual does not have to be pain-free in order to be found 'not disabled.'"). Credibility determinations are emphatically the province of the ALJ, not the court, and courts normally should not interfere with these determinations. See, e.g., Chafin v. Shalala, No. 92-1847, 1993 WL 329980, at *2 (4th Cir. Aug. 31, 1993) (per curiam) (citing Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) and Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964)); Melvin v. Astrue, 6:06 CV 00032, 2007 WL 1960600, at *1 (W.D. Va. July 5, 2007) (citing Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989)).  In the instant case, the ALJ's credibility determination is supported by substantial evidence, and should not be disturbed.[11]

## CONCLUSION

It is not the province of the court to make a disability determination. The court's role is limited to determining whether the Commissioner's decision is supported by substantial evidence, and in this case, substantial evidence supports the ALJ's opinion. The ALJ properly considered all of the objective and subjective evidence in adjudicating Walker's claim for benefits and in determining that her physical and mental impairments would not significantly limit her ability to do basic work activities. Accordingly, I recommend that the Commissioner's

---

[11] Walker also asserts that the ALJ erred by concluding that she is capable of performing her past relevant work. Walker's argument relies entirely upon her assertions that the ALJ erred in determining her RFC and assessing her credibility, as discussed above.  Walker does not assert that any errors occurred relating to the vocational expert hypothetical or testimony. Because I find that substantial evidence supports the ALJ's RFC and credibility determination, it follows that substantial evidence supports the ALJ's conclusion, based upon the testimony of the vocational expert, that Walker is capable of performing her past relevant work.

25

decision be affirmed, the defendant's motion for summary judgment be **GRANTED**, and Walker's motion for summary judgment be **DENIED**.

The Clerk is directed to transmit the record in this case to Norman K. Moon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

Enter: August 11, 2015

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge